UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | Criminal Action No. 05-30012 |
| | ) | |
| LUIS ZAYAS and | ) | |
| EDDIE MATOS | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS**

**I. INTRODUCTION**

The United States of America hereby opposes the motions to suppress filed by defendants Luis Zayas and Eddie Matos. Both defendants claim that their post-arrest statements were not freely given and that they were not properly advised of their rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Because defendants were advised of their *Miranda* rights, both orally and in writing, and voluntarily gave statements, the motions to suppress should be denied.

**II. FACTS**

Luis Zayas and Eddie Matos were arrested on March 3, 2005 after a lengthy investigation of their drug dealing. The investigation included surveillance, controlled drug purchases on three occasions by a cooperating witness and searches of the defendants' homes on the day of their arrests. Zayas and Matos lived at 37 and 38 Allendale Street in Springfield, Massachusetts, respectively. On March 3, 2005, search warrants for each residence were executed. During the searches, firearms and ammunition were found, as well as over 100 grams of cocaine base and a quantity of marijuana.

Prior to execution of the search warrants, ATF agents were surveilling Allendale Street. They observed defendant Eddie Matos leave with his wife and followed their vehicle to a parking lot next to a McDonald's restaurant, not very far from Allendale Street. At

approximately 10:15 a.m., Springfield police officers, working with the ATF agents, approached Matos in the vehicle and told him that federal agents wanted to speak to him. At that time, ATF Special Agent James Martin was entering the parking lot in a separate vehicle. Special Agent Martin parked near Matos and exited his car. He identified himself to Eddie Matos, showed him his federal credentials and explained that search warrants of 37 and 38 Allendale Street were going to be executed that morning. He then read a Miranda warning to Matos from a card that Special Agent Martin carries in his credentials. He told Matos that Matos could provide the agents with a key to his house if he wanted and that he would not be allowed to go back into the house while the search was going on. Matos gave S.A. Martin a key. S.A. Martin told Matos that he was not going to interview him then, but would be back later to talk to him.

     Matos was transported, in handcuffs and in a Springfield police department cruiser, back to Allendale Street. After the two residences were determined to be safe, i.e., no persons remained in the homes, Matos was transferred to an ATF vehicle. He was then driven to a location approximately two blocks away, where at 10:56 a.m. he was given another verbal Miranda warning and was also given a written Miranda warning.

     Matos was asked if he understood his rights and the waiver form and he indicated that he did. He then signed the form, which was witnessed by three agents. Matos then told the agents about some, but not all, of the items that would be found in his home. This included at least one gun and a quantity of marijuana. Matos also admitted that he used marijuana. Matos did not admit to the agents that he had stored other guns, including an assault rifle, and crack cocaine in his house. Only after these items were found and Matos was told about them did he admit that he knew those items had been stored in his house by Luis Zayas.

At no time did Matos appear to be under the influence of drugs. He told the agents that he had used marijuana that morning, about 9:00 a.m. He said that it had worn off by the time he was questioned in the ATF vehicle, around 11:00 a.m. Matos was very cooperative throughout the process and did not request an attorney at any time. Before he signed his statement, he was told that he could correct any errors. The statement was read to him while he was holding it, so he could follow along. He was asked if he understood the statement and if it was accurate; only after answering both questions affirmatively was he asked to sign it.

Luis Zayas was arrested in his home shortly after the search began at 10:30 a.m. He was told that ATF agents would be conducting a search of his and Matos' premises following up on a lengthy investigation. He was then read a Miranda warning by S.A. Martin from a pre-printed card. No questions were asked of him at that time. He was placed in a Springfield police vehicle while the search team secured his home; he was not questioned by anyone at this time, either.

After both houses were secured, and once S.A. Martin was able to return to Zayas, he was again given a verbal Miranda warning. At this time, 10:56 a.m., Zayas was also read the written Miranda warning from the waiver form and asked if he wanted to sign it. He agreed to sign it. Zayas was cooperative, and quickly took responsibility for the items found in Matos' home. He said that he stored the items (guns, crack cocaine and marijuana) there with Matos' permission.

Zayas was asked if he wanted to give a statement and he said he did. After additional questioning, a statement was written by S.A. Martin and read to Zayas. Zayas said he understood the statement and agreed that it was accurate, after certain corrections were made and initialed by him. He was not asked to sign a blank statement form nor was he asked to sign a

statement that had not been read to him. Throughout the questioning, Zayas appeared to the agents to be coherent and not under the influence of drugs.

### III. ARGUMENT

**A.     Appropriate *Miranda* Warnings Were Given, Understood and Waived**

Even if defendants are deemed to have been subject to interrogation, based on the totality of the circumstances,[1] each defendant was given a complete *Miranda* warning on at least two separate occasions prior to any questioning and prior to the defendants' statements. Although the government bears the burden to show that a waiver was voluntary when defendant makes a motion to suppress a statement in violation of *Miranda*, the government needs to do so only by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In light of the government's anticipated testimony from the agents who questioned the defendants that complete *Miranda* warnings were given at least three times, including twice verbally and once in writing which was signed by each defendant, this standard will be met.[2]

---

[1] Interrogation is not limited to direct questioning but also includes its "functional equivalent" such as "any words or actions on the part of police that are likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980). However, the fact of custody alone does not mean that a statement is the product of interrogation. "This is not to say. . . that all statements obtained by police after the person has been taken into custody are to be considered the product of interrogation. ...[C]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *Innis* at 299-300.

[2] The government expects to have all but one of the five individuals who witnessed the waivers available to testify. The remaining agent is in California on a long-planned vacation, which was set prior to the scheduling of this hearing and which is the first vacation the agent has taken in over eighteen months. This agent would be available to testify next week should the hearing be continued for that or any other purpose.

**B.     Defendants' Mental State Did Not Invalidate Their Waivers**

Both defendants argue that their waivers and statements were not voluntary because they were under the influence of marijuana and/or cocaine at the time of the interview. Whether or not an accused's confession was voluntary is determined by looking at the totality of the circumstances, including both the character of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Although courts must look at the "totality of all the surrounding circumstances" when determining voluntariness, since mental state alone does not negate a *Miranda* waiver, the government argues that the defendants' level of intoxication is, at most, a minor factor. *See id.*; *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)**.**

Defendant Matos alleges that he was "blasted" when he signed the *Miranda* waiver and made incriminating statements (Matos Aff. 8), and argues that his diminished mental capacity should be taken into account in determining whether these statements were voluntary. His statement directly refutes this: "I last smoked this morning (marijuana) at about 9:00 a.m. in my car... I am not under the influence of marijuana now because the high has worn off."

Mental state may be relevant to voluntariness if the statements were the product of police coercion. It is important to note, however, that "[t]his fact does not justify a conclusion that a defendant's mental condition, *by itself and apart from its relation to official coercion*, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164 (emphasis added). According to *Connelly,* suppressing a defendant's statements solely on the basis of his compromised mental state, absent any coercive activity on the part of police, "would serve absolutely no purpose in enforcing constitutional guarantees." *Id.* at 166.

The government's position is that both defendants were given clear *Miranda* warnings

and neither appeared to be in a compromised mental state. Neither was subjected to coercion; therefore, the influence, if any, of the drugs does not invalidate the defendants' waivers. *See, e.g., United States v. Palmer*, 203 F.3d 55, 60-61 (1st Cir. 2000) (finding waiver valid despite defendant's heroin withdrawal and use of antidepressants, based on law enforcement official's observation that defendant appeared "clear headed" and based on court's determination that defendant's clarity, tone, and ability to recall facts during his confession indicated lucidity); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d. Cir. 1989) (waiver valid despite defendant's severe pain and use of pain medication because defendant medical records indicated he was alert and active); *see also United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002).

C.      **Defendants Were Not Subjected to Unduly Lengthy Interrogation**

Defendant Matos's Memorandum in Support of Motion to Suppress Statements and Other Evidence, Points, and Authorities ("Matos's Memo") cites a Third Circuit case, *United States v. Johnson*, 816 F.2d 918, 922 (3d. Cir. 1987), for the proposition that unduly lengthy interrogations may suggest that a statement was given involuntarily. (Matos's Mem. at 5). While this contention may be true, the facts in Matos's (or Zayas') situation are not covered by the cited proposition. First, the initial inculpatory statements from both defendants occurred within minutes of when the federal agents were with the defendants. Second, even if the court considers the total time between the arrests and the conclusion of the encounter, it is was less than two and one half hours for Matos and approximately two hours for Zayas, as is shown by the time the statement was concluded (for Matos) and by the anticipated agent testimony for Zayas. No reported decision has been found in which a court deemed two and one-half hours to

be "unduly lengthy."[3]

D.     **There Was No Psychological Coercion or Deceitful Conduct by the Agents**

Both Zayas and Matos claim that law enforcement officials made false promises of leniency and threats of additional prosecution that caused them to each make incriminating statements. (Zayas's Aff. 4, 5); (Matos's Aff. 6, 7). While the government does not waive any legal arguments as to such alleged threats, its defense is simple: these supposed violations simply did not occur. Neither defendant was given any promise of leniency other than a general statement that whatever cooperation they provided would be noted and presented to the United States Attorney's Office.

A law enforcement official's promise to inform the prosecuting attorney of the defendant's cooperation is not impermissibly coercive. As the First Circuit stated in *United States v. Baldacchino*, "a promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985). Because this was the only type of statement made by law enforcement officials, there were no false promise of leniency or threats made.

Defendant Matos cites *United States v. Harris*, , 301 F. Supp. 996 (E.D. Wis. 1969), for the proposition that "a confession has been found involuntary where the defendant had a

---

[3] *See, e.g., Chambers v. Florida*, 309 U.S. 227, 239-40 (1940) (use of defendants' confessions that were obtained through interrogation lasting for a period of five days and various other tactics of intimidation was found to be a violation of due process.); *Ashcroft v. Tennessee*, 322 U.S. 143, 153-54 (1944) (court took into account the fact that defendant was questioned for thirty-six hours without sleep or rest when determining the validity of his confession.).

reasonable belief that the police had made a promise of leniency, even where no such promise was actually made." (Matos' Mem. 6). The facts in *Harris* are easily distinguishable from the defendant's situation. In *Harris*, the court focused on the defendant's "reasonable belief" in the promise made by the government. In reaching its decision to suppress the defendant's confession, the court relied on a "pattern of cooperation" that existed between the defendant and the government: (1) "the defendant's account of the circumstances of his confession [was] uncontradicted," (2) at the time the confession was made, prior conditions set by the defendant had been met by the government, and (3) the defendant had no reason to believe that the third of three conditions he had set would not be met by the government. *Id.* at 999. None of the factors upon which the court relied in *Harris* are present here. First, the defendant's and the government's versions of the circumstances of the defendant's confession *are* contradicted. Second, there were no prior conditions set by the defendant upon which the government had acted. There is no need to reach the third prong here because there were no conditions, i.e., there was no bargain set up between the government and either defendant.

Nor did the questioning follow immediately upon taking either defendant into custody. Instead, defendant Zayas was held for approximately sixty-five (65) minutes, and defendant Matos was held for approximately forty-one (41) minutes, before questioning began. These time frames are documented in the written waiver forms and by the anticipated agent testimony as to the time when the defendants were taken into custody. Thus, contrary to defendants' assertion, each had ample time in which to contemplate how they wished to proceed with the agents.

## IV. CONCLUSION

Defendants were given complete *Miranda* warnings on three separate occasions each.

8

Neither was so intoxicated as to be unable to understand the warnings. The government will present a number of witnesses who will testify credibly to these facts, and to the fair nature of the encounter between them and the defendants. After hearing the testimony, and reviewing the documentary evidence, the Court should DENY the motions to suppress.

        Respectfully submitted,

        MICHAEL J. SULLIVAN,
        United States Attorney

By: _____

        Thomas E. Kanwit
        Assistant U.S. Attorney
        Joseph J. Moakley U.S. Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3100