## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **V.** ) | Criminal Action No. 05-30012 NG |
| ) | |
| **EDDIE MATOS** ) | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States submits its sentencing memorandum regarding the applicability of the safety valve provision of 18 U.S.C. § 3553(f), an enhancement for possession of a gun, an adjustment for a mitigating role and the government's sentencing recommendation.

    **A.**    **Defendant Was a Close Associate of a Significant Dealer of Illegal Drugs**

Matos seeks a mitigating role adjustment on the ground that he was less involved than Zayas. This comparison is true, but it is insufficient to justify the adjustment because Matos admitted to dealing on his own and was not just a minor participant.[1]

Luis Zayas and Eddie Matos admitted, both at the time of their arrest and at their change of plea hearing, that they possessed with an intent to distribute almost two pounds of marijuana and 108.9 grams of crack cocaine. See PSR ¶¶ 2, 4 & 26. The total weight of drugs found is inconsistent with either personal consumption or small quantity sales. Moreover, Zayas told federal agents that he had just purchased the marijuana and cocaine the night before his arrest; this shows that he purchased in significant quantity as well.

Consistent with the reality that Zayas was a full-time drug dealer of significant quantity is

---

[1] Matos' argument that he might not have made much money from the dealing is unsupported by evidence and irrelevant besides. Nor is it compelling that Zayas could have conducted his operation without Matos. Nor is there any evidence that Zayas was Matos' "boss," *see* defendant's objections to PSR, objection #7.

the fact that during the search $1,600.00 was found in his bedroom. Again, this is the morning after he bought thousands of dollars' worth of drugs on Long Island. Someone who was dealing small quantities is unlikely (a) to purchase such large quantities at one time; (b) have such large quantities on hand; and (c) still have $1,600 cash left over right after the purchase.

Matos was a close associate of Zayas. He admitted that he and Zayas regularly hung out and got high together. He admitted that he went with Zayas the night before the search to buy marijuana and cocaine. Matos was dealing marijuana for Zayas as well as for himself. Matos was directly involved in one of the undercover crack cocaine purchases, coming out of his house to deliver the drugs to a third individual ("Chino"). Chino was another associate of Zayas and Matos; Matos knew that he was facilitating a sale of crack when he turned the drugs over to this person, who then exchanged the drugs for money in front of Matos.

On the occasion of another drug sale, conducted directly by Zayas, the CW was brought to Matos' house. Matos was bagging marijuana and selling it to customers in the CW's presence, then Matos handed the cash to Zayas.

Matos allowed Zayas to store large quantities of drugs at his house. The night before the search, Zayas and Matos cooked the cocaine they bought in New York and made it into cocaine base. Matos also let Zayas store his guns in Matos' house, including an AR-15 assault rifle and a hand gun on top of the kitchen cabinet. This handgun was found next to the pan used to cook the cocaine within hours of when the cocaine was brought back from New York and cooked. The gun was loaded. A reasonable inference, in light of the testimony of the CW, is that Zayas took the gun with him to protect himself, Matos and the money and/or drugs and that Matos agreed to keep the gun close to the drugs for protection.

**B.     Defendant Possessed Firearms in Connection with the Offenses**

There are two separate issues, at least, regarding defendant's possession of firearms. At the broadest level, there is the sentencing enhancement for possession of a firearm during the offense, U.S.S.G. § 2D1.1(b)(1), and there is the potential applicability of the safety valve provision in 18 U.S.C. § 3553, of which defendant may not avail himself if he possessed a firearm in connection with the offense. The Court is well familiar with the jurisprudence in these areas. For the reasons that follow, it is the government's position that defendant is subject to a two-level enhancement under the guidelines and is ineligible for the safety valve due to his gun possession in connection with the offenses (among other reasons).

The facts of the gun possession are not in dispute. Three guns were found in Matos' residence during the search along with ammunition to match each gun as well as some additional ammunition. See PSR ¶ 15. Among the guns found was an AR-15 semi-automatic assault rifle, along with .223 caliber ammunition in a 30 round magazine and elsewhere. *Id.* A .25 caliber handgun was found on top of one of the kitchen cabinets in a loaded state. This gun was located next to a pan that had been recently used to cook cocaine into crack and a bag of marijuana. Matos' girlfriend indicated that the pan had been hanging up in her kitchen, clean, before Zayas and Matos went to Long Island the night before the search.

Under the sentencing guidelines, "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 Application Note 3. As stated by the First Circuit:

> Section 2D1.1(b)(1) permits a two-level enhancement if a
> dangerous weapon (including a firearm) was possessed. To garner
> this enhancement, the government has the initial burden of
> establishing that a firearm possessed by the defendant was present

3

> during the commission of the offense. Once the government has
> made that showing, ***the burden shifts*** to the defendant to persuade
> the fact finder that a connection between the weapon and the crime
> is clearly improbable.

U.S. v. Anderson, 452 F.3d 87, 90 (1st Cir. 2006) (emphasis supplied).

In Anderson, the First Circuit made it clear that there is, in fact, a burden shift once the government has made an initial showing of the presence of a gun. Id.[2] Whether it is characterized as a true burden shift, or merely a burden of production, or even if it is characterized as the government's burden to prove that it is not clearly improbable, see U.S. v. Juan, 59 F.Supp. 210 (D. Mass. 1999), the government argues that it makes no difference in this case. There is no doubt that there were three firearms possessed by the defendant and that they were present during the commission of, at least, the conspiracy offenses. Matos knew the guns were in his house for some time before the search.[3]

Nor is it clearly improbable that there was a connection between the guns and the drug crimes. The .25 caliber handgun was loaded and right next to marijuana and the pot used to cook the cocaine into crack. This shows that it was readily available. Also, the gun was loaded, further indicating that it was not clearly improbable that the gun was used to protect the drugs or the defendant when he was engaged in buying or selling drugs. Indeed, given his admission that

---

[2] *Accord U.S. v. McDonald,* 121 F.3d 7 (1st Cir. 1997); *U.S. v. Patterson*, 145 Fed.Appx. 988, *993, 2005 WL 2077507 (6th Cir. 2005); *United States v. Moses,* 289 F.3d 847, 850 (6th Cir.2002).

[3] Zayas claimed during his safety valve proffer that he moved the guns a year before the search. The government questioned the veracity of this previously, but if true, it only makes it clearer that Matos was abetting the storage of guns along with the drugs. But for the purposes of the guidelines enhancement, it does not matter when the guns were placed in Matos' residence so long as they were present during the trafficking conspiracy's time span.

he went to Long Island the night before his arrest to buy cocaine, and the location of the .25 caliber handgun next to the crack pot, it is probable that defendant took the gun with him on the trip for protection.  U.S. v. Corcimiglia, 967 F.2d 724, 727 (1st Cir. 1992)(weapon's location made it readily available for protection of the participants or the drugs and cash, thus there was sufficient evidence of a connection between the gun and the crime).  Certainly, this is not highly improbable.[4]

> We have held in numerous contexts that the concept of possession of a weapon encompasses both actual possession and constructive possession.  We see no reason to exclude constructive possession from the safety valve provision. The purpose of the safety valve is to prevent mandatory minimum sentences from causing the "least culpable offenders [to] receive the same sentences as their relatively more culpable counterparts."  The culpability is virtually the same for a defendant who possesses a firearm on his person and a defendant who has a firearm within his personal dominion and control while committing that same offense.

U.S. v. Matias,  465 F.3d 169, 174 (5th Cir.2006).

"A defendant who, for example, has a concealed weapon strategically placed in a room where he conducts his drug business is no less dangerous than a defendant who conducts his business with a weapon on his person," U.S. v. McLean,  409 F.3d 492, 501 (1st Cir. 2005); Anderson, at 92 (prosecution need only prove that defendant possessed the weapon during the currency of the offense, not that he actually used it and defendant's admission that there was a loaded gun in a location where he sold drugs was sufficient).   Zayas and Matos concealed the .25 caliber handgun in a location which they could access quickly while they were preparing the

---

[4] The fact that a jury acquitted Matos' co-defendant of the use in furtherance charge, 18 U.S.C. 924(c), has no bearing on the enhancement because the standard of proof differs for sentencing and the Court's instructions to the jury imposed a different substantive burden on the government.  Moreover, unlike Zayas, the gun was in Matos' residence.

cocaine base. It is probable that Zayas carried the gun during his drug purchase and he likely had the gun in closer proximity while he was buying, transporting, cooking and selling cocaine. Matos pleaded guilty to a conspiracy to commit these crimes with Zayas; he cannot avoid the use of the gun, therefore, as it was an intrinsic part of the criminal endeavor.

### C. **Defendant Is Ineligible for the Safety Valve Provision**

18 U.S.C. §3553 (f) allows a court to sentence a defendant below a statutory mandatory minimum sentence if, and only if, defendant proves by a preponderance that he meets five criteria.[5] Four of these criteria are not in doubt; defendant has only one criminal history point and his offense did not result in death or serious bodily injury (at least so far as we know– with trafficking in crack cocaine one cannot be sure). 18 U.S.C. § 3553(f)(1) & (3). Nor was Matos a an organizer, leader, manager or supervisor of others in the offense. 18 U.S.C. § 3553(f)(4). Finally, Matos eventually gave a mostly truthful proffer- although he initially told several lies that had to be corrected during the course of the proffer.

Defendant cannot, however, meet the second criteria because he possessed, or he induced another to possess, a firearm in connection with the offense. 18 U.S.C. § 3553(f)(2). The relevant facts and arguments regarding defendant's possession of the firearm in connection with the offense were set out in section B above. It is worth noting here, however, that it is defendant's burden to show that he did not possess or cause another to possess the firearms in

---

[5] Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, 108 Stat. 1796 ("VCCA"), created a "safety valve," designed to allow some of the "least culpable offenders" to escape the harsh application of the mandatory minimum. *See* H.R.Rep. No. 103-460, at 4 (1994); VCCA § 80001, 108 Stat. at 1985 (amending 18 U.S.C. § 3553 ); U.S. v. Hunt 503 F.3d 34, 36 (1st Cir.2007).

connection with the drug trafficking. Defendant cannot meet this burden, as he admitted that he allowed Zayas to store the guns at his house, a location from which drugs were sold. Moreover, defendant cannot prove that the guns were not possessed in connection with the drug trafficking. See U.S. v. Thompson, 190 F.Supp. 138 (D.Mass. 2002).

### D.     The Cocaine Was Crack, Not Powder

The government is perplexed as to defendant's claim that the cocaine base seized during the search was cocaine hydrochloride, or powder, rather than cocaine base, or crack. The chemist's report clearly establishes that the cocaine substances evaluated were all crack, both by chemical analysis and by appearance. If required, the government is prepared to prove this in an evidentiary hearing; however, defendant Matos pleaded guilty to crimes involving crack cocaine, not powdered cocaine, and such proof should not be necessary.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that defendant be sentenced to the ten-year mandatory minimum sentence pursuant to 21 U.S.C. §841(b)(1)(A)(iii) as he is responsible for, and allocuted to, more than twice the threshold amount (fifty grams of cocaine base).

In the alternative, if the Court finds that Matos is eligible for the safety valve, then the government recommends that Matos be sentenced at the low end of the guidelines, which is 87 months. Although this is a significant sentence, it is almost three years less than the sentence given Zayas. It is a reasonable and fair sentence in light of defendant's guilty plea to numerous counts of significant drug dealing. Although Matos may not have been the key player, he was, by his own admission, heavily involved in a conspiracy that was dealing significant weight and

which involved three firearms as well.[6]

                                Respectfully submitted,

                                MICHAEL J. SULLIVAN,
                                United States Attorney

                    By:   /s/ thomas e. kanwit
                                Thomas E. Kanwit
                                Assistant U.S. Attorney
                                J. Joseph Moakley U.S. Courthouse
                                1 Courthouse Way, Suite 9200
                                Boston, MA 02210
                                (617) 748-3100

June 18, 2008

      Counsel certifies that this document was filed using the CM/ECF electronic document filing system of the District of Massachusetts on this date and that it is counsel's understanding that it will be served on counsel for defendant via that system

                                      /s/ thomas e. kanwit
                                     THOMAS E. KANWIT

---

[6] Matos' uneventful history during the two years he has been on release is commendable, but it does not eliminate the fact of his prior crimes, for which he is being sentenced.