UNITED STATES DISTRICT COURT
DISTRIT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NO: 05-30012-NG |
| | : | |
| EDDIE MATOS | : | |

DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

Now comes the Defendant, Eddie Matos, through counsel, and respectfully submits this Sentencing Memorandum and Motion for a downward variance/departure in connection with his sentencing by this Court on September 13, 2008. Mr. Matos requests the Court to sentence him to time served (one month) with credit given for two and a half years of supervised release, with an additional three years of supervised release with a special condition of six months in community confinement followed by six months of home confinement. Specifically, this memorandum seeks to address issues raised on July 9, 2008 during the sentencing hearing.

I. Denying Mr. Matos the Safety Valve Would Conflict with the Legislative Intent of the Statute

Mr. Matos' recommendation in light of the circumstances of this case is consistent with the aims of the safety valve. The legislative history of the safety valve shows that Congress' intent to improve the "consistency [and] rationality" of federal sentencing. H.R. Rep. No. 103-460 (Lexis). Prior to the enactment of the safety valve "mitigating factors . . . [did] not apply to

the least culpable offenders except in rare instances . . . [resulting in the] least culpable offenders . . . receiv[ing] the same sentence as their relatively more culpable counterparts." Id. Thus, the overall purpose of the safety valve was to direct penalties "toward relatively more serious conduct." Id.

Mr. Matos was a minor participant in the conspiracy. He knew that Mr. Zayas used his house to store drugs, but Mr. Matos himself did not profit from this arrangement. Mr. Zayas, on the other hand, operated a multi city drug trafficking operation, which included drug stashes at several locations. Mr. Zayas was a very big fish. The safety valve was enacted to prevent least culpable parties, like Mr. Matos, from receiving the same sentence as kingpins, like Mr. Zayas. Mr. Zayas was sentenced to 10 years for his crimes. To sentence Mr. Matos to the same 10 years as Mr. Zayas will not accomplish the goals of sentencing expressed by Congress.

II. Mr. Matos is Safety Valve Eligible.

Mr. Matos should receive a non-mandatory sentence because he is safety valve eligible. To be eligible for the safety valve Mr. Matos must demonstrate that he did not "possess a firearm or other dangerous weapon in connection with the offense." 5C1.2(a)(2). This standard contains two elements: possession and a nexus between the firearms and drug trafficking. The Governments argument that Mr. Matos possessed the gun ultimately fails for two reasons. First, Mr. Matos had no knowledge of the presence of the firearms. Second, assuming arguendo that Mr. Matos did know of the presence of the firearms, he never intended to exercise any control over the weapons. Lastly, assuming arguendo that the firearms were possessed, there is no relationship between the guns and Mr. Matos' drug related activities.

### III.  Mr. Matos Did Not Possess the Firearms Because He Had No Knowledge That the Guns Were in his Home

The guns found in Mr. Matos's basement can immediately be ruled out as being possessed by Mr. Matos based on lack of knowledge. Knowledge is a required element of possession. *See* United States v. McLean, 409 F. 3d 492, 501 (2005) ("possession occurs when a person *knowingly* has the power and intention at a given time to exercise dominion and control over an object either directly or through others") (emphasis added).  Special Agent Person testified that the guns hidden in the rafter could not be seen unless one "got a step ladder or something to climb up there." ZT p. 174, ¶ 19-21.   The statements extracted from Mr. Matos and Mr. Zayas by the AFT agents indicate that Mr. Zayas moved the guns into the house without the permission of Mr. Matos.  See Defendant Matos & Zayas Statements.  Mr. Zayas had a key to the house, giving him unfettered access.  The fact that these guns were hidden supports the claim by Mr. Matos and the co-defendant, Mr. Zayas, that Mr. Matos did not know the guns were in the house.  Ultimately, Mr. Matos could not have been in actual or constructive possession of either of the firearms in the basement because he lacked knowledge that the firearms were present.

The .25 pistol found on top of the cabinet also was not possessed by Mr. Matos because Mr. Matos had no knowledge of the presence of that firearm until shortly before the search warrant was executed.  The top of the cabinet was a location where Zayas and Matos commonly put marijuana for safekeeping, much like a spot on a kitchen table where one puts their keys. This location was elevated such that one would have to use the assistance of a ladder to actually see any items stored in that location.

The morning the raid occurred, Mr. Matos reached on top of the cabinet to grab recover some other property. As he did so he felt the .25 on top of the cabinet. Mr. Zayas had been over at the house the night before. Mr. Matos figured that Mr. Zayas had left his gun over at the house. At this time Mr. Matos' wife was pregnant with twins. This was a high risk pregnancy. He did not want to scare her so he left the firearm there until a later time when it could be returned to Mr. Zayas. Mr. Matos stated that his fingerprints might be on the gun only because of the incident that morning where he felt the gun present, not because he actually handled or possessed the gun.[1] This brief period of time hardly offered Mr. Matos an opportunity to safely rid himself of the unwelcomed firearm. It would offend senses of justice and fair play to hold Mr. Matos accountable for knowledge of the .25 where Mr. Matos had knowledge of the gun for only a few minutes. The requirement of knowledge should not be deemed effectuated at the very moment when Mr. Matos discovered the gun where Mr. Matos did not have a safe opportunity to rid himself of it. This is especially true where very real safety concerns existed because of Mr. Matos' wife's high risk pregnancy.

IV. <u>Mr. Matos Did Not Possess Any Of the Firearms Because He Had No Intention of Exercising Control Over the Guns</u>

Assuming arguendo that Mr. Matos had knowledge of the firearms, he was still not in possession of the firearms, because he had no intention of exercising control over the weapons.

---

[1] The prosecution attempts to tie Mr. Matos to the .25 by stating that Mr. Matos admitted that "[he] possessed it." MST, 10¶ 3. The statement signed by Mr. Matos that he "possessed" the gun should be disregarded. The ATF used the term "possessed" in the statement that Mr. Matos signed for obvious reasons. The term "possessed" has a specific legal connotation that could be confused by a lay person who is unfamiliar with the legal significance of that word. In this case the ATF used the term "possessed" in a legal sense to deceive Mr. Matos into signing a statement that would futher incriminate Mr. Matos beyond his actual culpability. In common English language a person would not say that they "possessed" something to describe ownership or responsibility, which is exactly the impression that is created by the ATF inserting the term "possessed" into Mr. Matos' statement.

"[T]here must be some action, some word, or some conduct that links the individual to the [gun] and indicates that he had some stake in it, some power over it." United States v. McLean, 409 F. 3d at 501, citing In re Sealed Case, 105 F. 3d 1460, 1463 (D.C. 1997). While the prosecution tried to characterize constructive possession as being automatically effectuated simply by a person knowing that there is a gun in their house, MST p. 6, ¶ 17-18, this is simply not the law. Constructive possession does not occur unless the defendant *intends* to exercise control over the weapon. Id.

There is zero evidence that Mr. Matos intended to exercise control over any of the guns at any time. Mr. Matos did not handle the gun. Mr. Matos did not carry the gun. Mr. Matos asked Mr. Zayas to remove the guns from his house. Mr. Matos does not like guns. The confidential witness ("CW") never saw Mr. Matos handling any guns. Even the Government's star witness cannot point to any time where Mr. Matos handled any of the guns or otherwise acted in a manner that suggested he had any intention of exercising any control over the guns. There is no per se rule a firearm found in a home where drugs are located is always possessed "in connection with the offence." *See* United States v. Torres-Maldonado, 14 F. 3d 95, 103 (1st Cir. 1994) (proximity alone is insufficient to establish constructive possession).

The Government also tries to downplay the lack of Mr. Matos' fingerprints on the gun by stating that this fact is "indicative of nothing … [because] 95% of the time when you print a gun you get nothing." MST, 9-10. But in this case the fact that another person's fingerprints were found on the gun is significant. Prints could be lifted from this firearm, because Mr. Zayas' prints were. Yet the Government is trying to point the finger at Mr. Matos as possessing the firearm by citing the lack of evidence as evidence. Both the evidence available in this case, as

well as the lack of evidence by the government satisfies the preponderance standard that Mr. Matos was not in possession of any gun at any time. Thus, he is eligible for the safety valve.

V. <u>Mr. Matos is Eligible for the Safety Valve Because the Guns Were Never Possessed In Connection with the Conspiracy</u>

Even assuming, arguendo, that Mr. Matos did possess the firearm, he is still eligible for the safety valve because the firearm was not possessed in connection with the offense by either Mr. Matos or Mr. Zayas. *See also* <u>United States v. Anderson</u>, 452 F. 3d 87, 89 (1st Cir. 2006) (government choose not to argue ineligibility for safety valve where evidence tended to show that weapons were for personal protection, not in connection with offense.). There is evidence that Mr. Zayas, the owner of the guns, didn't acquire or possess the guns because of the drug operation. If the owner didn't possess the firearms in connection with the offense then it can hardly be said that Mr. Matos possessed the firearms in connection with the offense as an aider or abettor.

Mr. Zayas faced the same question at trial.[2] First, the testimony by the only witness at trail that the guns may have been related to the drugs was extremely unreliable. The confidential witness (CW) didn't tell authorities that Mr. Zayas had allegedly carried the .25 caliber pistol until several days before trial. Zayas Trial Transcript ("ZT") p. 15, ¶ 12; p. 20, ¶ 6; p. 56, ¶ 16; p. 113, ¶ 1-3. Furthermore, the CW told Agent Martin of the ATF that "[Mr. Zayas] recently obtained [the guns] because he felt there was threat on him, somebody was going to be coming after him…it was a threat related to [the CW's family] and the Zayas family." ZT p. 74, ¶ 14-18. There was not any testimony that this threat was a result of drug related activity.

---

[2] Zayas was charged with possession of a firearm "in furtherance," whereas under the safety valve the statutory language is "in connection with." It appears that the two phrases have identical or nearly identical legal meanings.

The testimony from trial indicated that the only time that Zayas apparently ever used one of the guns it was not drug related. ZT p. 25, ¶ 14. In the area of Springfield where Mr. Zayas and Mr. Matos lived, people get shot for insignificant things like looking the wrong way at girlfriends or leaning on someone's car. ZT p. 133. Guns are often a status symbol that gives bragging rights to the owner. ZT p. 133. As was stated in the trial transcript, it is certainly possible for a person engaged in drug crimes to possess a firearm for a purpose other than something related to the act of selling drugs.

Finding guns in a ceiling rafter that are not visible or easily accessible seems inconsistent with the purpose of possessing a gun for the reasons that a drug dealer would have a gun. Even the .25, which appears to be the Government's best shot at showing a "connection" does not have a history that supports this assertion. The CW offered direct testimony that there was a threat unrelated to drugs for which Mr. Zayas purchased the guns. ZT p. 74, ¶ 14-18. ZT p. 74, ¶ 14-18.

Possessing a gun for self-defense in response to this threat would not have any bearing on eligibility under the safety valve. See United States v. Anderson, 452 F. 3d at 89. This goes to the point that if Mr. Zayas didn't have the firearms in connection with the offence than Mr. Matos could not have had the guns in possession with the offense as an aider or abettor of Mr. Zayas's activities. Most importantly *there is absolutely no evidence that Mr. Matos ever carried, used, or otherwise had anything to do with the guns.*

VI. Mr. Matos Cannot Be Held Accountable for the Actions of Mr. Zayas

Mr. Matos cannot be held accountable for Mr. Zayas' actions in relation to the firearms. It is well settled law that a defendant cannot be denied safety valve eligibility based on coconspirator

liability, rather "in order for the safety valve to be precluded because of a firearm enhancement, a defendant must possess or induce another to possess a firearm in accordance with § 5C1.2(a)(2)." United States v. Ramon Figueroa-Encarnacion, 343 F.3d 23, 35 (1st Cir. 2003).

Ultimately, Mr. Zayas used Mr. Matos' house as his own. Mr. Zayas had a key. Mr. Zayas kept his drugs at the house. It would be more factually accurate to consider Mr. Matos and Mr. Zayas a sharing the residence, rather than it being exclusively occupied by Mr. Matos. Under these circumstances

VII.   Summary of Argument in Support of Safety Valve Eligibility

On the simple facts in the record thus far, Mr. Matos can demonstrate by a preponderance of the evidence the he did not possess a gun in connection with the drug conspiracy. There is fingerprint evidence to this effect, testimony from the CW that the guns were not obtained in relation to the drug conspiracy, testimony that Mr. Matos was never seen handling the firearms, and evidence that Mr. Matos never even knew the guns were in his house. The best evidence that the Government can produce is testimony from an extremely questionable witness that Mr. Zayas may have carried the .25. These are matters of fact for this Court to decide, and the Court has wide discretion in making its factual determinations. See United States v. Henry, 472 F.3d 910 (D. C. Cir. 2007) ("sentencing judge must make factual determinations such as 'Did the defendant carry a gun during the drug transaction?'").

VIII.   The Sentence recommended by Mr. Matos is Reasonable

The PSR report states that Mr. Matos should be sentenced at level 29. PSR p. 8. As a offender with one criminal point, the sentence under the guideline range is 87-108 months. However, this range is incorrect. Mr. Matos' base offense level is 30. Mr. Matos should receive a 3 level reduction for acceptance of responsibility, a 2 level reduction as a minor participant,

and a two level reduction that accompanies safety valve eligibility.  See Defendant's Sentencing Memorandum.  This results in adjusted offense level of 23.  Mr. Matos has a criminal history category of I.  The sentence under the guideline range for a level 23 with a criminal history of I is 46-57 months.

Mr. Matos is proposing that he be sentenced to time served (one month) with credit given for two and a half years of supervised release, with an additional three years of supervised release with a special condition of six months in community confinement followed by six months of home confinement.  This is a total of 73 months of punishment.

However, the guidelines are only advisory, United States v. Booker, 543 U.S. 220 (2005) and "the sentencing court may not mechanically assume that the GSR frames the boundaries of a reasonable sentence in every case."  Gall v. United States, 128 S.Ct. 586, 596-97 ( 2007).  Mr. Matos has a consistent employment record and strong roots in the community.  He has a respectable family and is a devoted father.  Mr. Matos has also essentially been on house arrest for three years.  Under these circumstances Mr. Matos' recommended sentence is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing."  18 U.S.C. § 3553(a).

IX. Conclusion

For the above reasons the Defendant respectfully request that this Honorable Court find the Defendant eligible for relief under the safety valve.

                                                The Defendant

By his Attorney:    /S/ Perman Glenn, III
                            Perman Glenn, III
                            Law Offices of Perman Glenn, III
                            1163 Main Street
                            Springfield, MA 01103
                            (413)734-9955

August 9, 2008